So, Mr. Frey-Witzer, you've reserved two minutes for a rebuttal, but before we start just give us a minute, but I've always wanted to say this in court, what's a ute? We have made enough two-utes arguments, Your Honor. I believe it. It's one of my favorite movies. Well, it's the best law movie of all time. It is. But anyway, so you've got eight minutes out of the game. You may proceed. Thank you, Your Honor. Good morning, and may it please the Court. My name is Evan Frey-Witzer, and I represent Plaintiff Appellant Ute LLC. With me is my colleague, Val Gervitz. Your Honors, this case involves a number of novel questions arising out of the three distinct provisions contained in Section 1201 of the Digital Millennium Copyright Act, which are who have employed effective technological measures intended to prevent the public from accessing or copying their copyrighted content, and to prohibit the trafficking in circumvention tools that are designed to thwart those technological measures. And while I'm anxious to discuss those novel questions, and I believe that the District there's a much simpler reason why this Court should reverse the District Court's dismissal of Ute's complaint. A proper analysis of the legal issues in this case require that this Court have a fully developed factual record before it, something that the Court does not have, because the case was dismissed at the Rule 12 stage despite a preponderance of disputed factual issues and questions of mixed fact and law that should have precluded such a result. So look, I guess it seems to me that for your declaratory judgment action and for some of the other claims, you have to plead a negative, basically, right? Yes, Your Honor, that's correct. You have to plead the absence of technological, you know, protection for the copyrighted material. And so that's a little tricky. That's a little unusual. Most of the, most cases you have to affirmatively plead facts that establish something. But I mean, is there any doubt as to whether your guys know what this technology is? I mean, in other words, you might have incentive to plead bare bones and plead in such a way that this can't be resolved on a motion to dismiss. But, you know, if you fully know the technology and that comes out in discovery, is that not sanctionable then to plead in such a way to suggest that there is no technological protection? Well, let me answer that in a few ways, Your Honor. First of all, the statute, of course, breaks things down into protections for access and protections for the rights of copyright holders. And that's commonly known as the copy control provisions. When you start with the question about access control, Your Honor, there are no protections for access control. The YouTube website is freely available to anyone with a computer and a web browser. The content that the RIO- It seems to me you're using an excessively narrow definition of access because the access that is available to a user of YouTube does not include, it's limited access, access in the sense that you can watch it on YouTube, but you can't watch it by downloading it to your computer and thereafter watching it without going through YouTube, at least unless you go through some very extensive, complicated processes, which I think both sides agree are available. But there's a difference between access in the sense of just being able to watch and download, so as thereafter to be able to watch without going through YouTube and being exposed to all that advertising. There absolutely is, Your Honor, but that is the difference between, I would suggest, the access control provisions and the copy control provisions. And in fact, this court, in the Corley case, the only case that this court has addressed the provisions of 1201. This court was careful to say, and almost every court that's considered it is careful to say, that the only thing that the access control provisions are aimed at is whether or not you can get to the content. The digital wall that is built around the book, as it is said, and this court has said what happens to the content after that, the copying question, that is irrelevant to the access question. And there's no question but the access is made available to everyone. And so- The point is that a clever layperson could do exactly what you is doing, it just would require a lot of steps. No, Your Honor. I mean, yes with respect to the copying, but no with respect to the access. The access requires nothing. The access requires that you type in youtube.com and search for whatever video you would like to watch. The content that the RIA is trying to protect is made available to everyone who has a web browser and a computer. Now- You're just talking about any person's access to looking at a video, both the video and the audio. You go to YouTube, you input what you want, and you have it. And that's what access is, in your view, is that right? Yes, Your Honor. And if you look at the Hattler case that we cite in our briefs, it's directly on point because it is a question about whether or not someone who has accessed a video through streaming and then copied it and used it for their own purposes, whether or not that person has violated the access control portions of the statute. And the court said no. And the Lexmark case as well addresses that and talks about how, although there may be protections against certain copying, if the access to the content is freely allowed or allowed in any kind of fashion, it can't be said that whatever happens violates the 1201A portions of the statutes. Now, the 1201B portion of the statute is a different question. But once you get to that, it's not simply a question of whether or not there is a technological measure that protects the copyright holder's interests. And as an aside, so far we have two amici who have said, this doesn't even do that. And so I would submit that it's a factual question. But every other element of the statute of 1201B involves factual questions. Was the software designed primarily to infringe upon the copyright holder's interests? Well, for one thing, there is a ton of material on YouTube, in fact, the majority of material, that is not protected by any copyright. This is simply the modern day VCR that allows you to record things. And is it protected by copyright? Some stuff is, but a lot of stuff is not. But there's a lot of material that is protected by copyright, and the RIA represents entities that have interests, such interests. And part of what has puzzled me here is that in talking about effective measures to control access and use, it seems to me that you have outlined a very detailed, as Judge Sullivan was referring to, process by which you can download, I could do it, the video, download the audio, and then merge them together. But the fact that they need to be merged and are available only separately suggests to me that YouTube did have in mind a way to protect the material that is copyrighted. And that the suggestion that because I could find those values online doesn't really mean that it isn't a measure designed to control access. It's less than scrambling or encryption. But it still is something quite other than serving up both access and downloadability. Well, as a first matter, Your Honor, there is a question as to what YouTube intended with these measures. We don't know, because YouTube isn't here. YouTube has not come in as an amicus. And YouTube, we have not had the opportunity to question YouTube about that. YouTube certainly could put in place a system that protected against copying and downloading. And in fact, YouTube has a separate service called YouTube Television, in which they do just that. You can't access it without a separate password. Netflix has that. Amazon- It's not to say that you couldn't do more, but why isn't this enough? Well, we don't know that that's what the intent was at all, Your Honor. What's the basis for saying there's an intent requirement in this statute? I scoured it, but I didn't see anything that suggests an intent requirement. Well, Your Honor, in this case, I'm sorry, in this court, in the district court for Corley, there is talk about- Wait, hold on one second. You want to take a minute? You sure? Yeah, go ahead. All right, continue, sorry. There's talk about whether or not, I'm sorry, let me return to the statute. The statute could simply say technology. It doesn't. It says a technological measure. And the measure is something that is intended to do something. Do you think measure implies intent? I think technological measure implies that there has to be a reason that this was put into effect. Now- What is it? Not just that it has an effect. Well- I'm not sure it changes anything that much, but you make a big point of saying that we need to know the intent. And it's not clear to me at all why we need to know the intent. We may need to know the technology better than the district court did based on the pleadings. And we don't even know if that's the effect, your honor, because although it is somewhat convoluted, one can do the same thing without ever using UTE's technology. Well, it seems to me that if it's a complicated process that requires seven different steps, that still wouldn't make it a technological measure necessarily, because it's not technological if it just requires just repeated steps. It seems to me a contractual provision that says you can't download is not a technological measure. But here there is, I think that based on what the district court was limited to, because it's basically just the pleadings, there's not a lot of matter that the court could take judicial notice of even. The district court seems to be relying on the fact that it's extending the length or the duration of the material being viewed, put a lot of stock in there. Why is that not a technological measure? There's a limiting of the duration of the clip, of the video clip. I'm sorry, I don't think that in my reading that the district court focused on the duration question. The district court seemed to focus on the idea that a user doesn't typically have access to what the district court called downloadable files. And with all due respect, there is no such thing as a downloadable file versus a streaming file. It's one file that you can either access or you can't access. I don't see why it's not a technological measure. I mean, it's not a separate technological measure such as encryption or something like that. But the process by which one gets access is all technology. And the fact that it isn't a separate technological measure makes it a little different from the kind of normal, most expected, likely model. But it's still, it is technology that enables a user to get access. Everything that one gets, one gets through technology. So I don't see how it's escapable that it's a technological measure. Well, your honor, it needs to be a technological measure that effectively prohibits the conduct. The Electronic Frontier Foundation- Well, why does it have to prohibit? In any event, it prohibits access, you're saying? It has to either prohibit access or it has to prohibit the infringement of a exclusive right of the copy holder. Those are the two different sections. Excuse me, it says control access, not prohibit access, right? Yes, your honor, that's- Because I think that might be different. That's a big difference. I would also say, and the analogy is frequently used about a book behind a locked door and whether or not that is controlling the access to the book. The argument that the RIAA is advancing here is if that book were in a library, your honor, freely available to anyone who wants to come in and look at it, but the library has a front door, it's not locked, it's front door, and in fact, over the library, it says, open 24 hours, seven days a week, come on in if you want to. The library put the door up simply to keep out the rain and the snow and the cold. And the argument is, well, it inadvertently, it unexpectedly, it unintentionally controls some sort of access to the book because you have to open the door. That, I would suggest, is what is the main argument for the RIAA here, in that they are saying it doesn't matter. It doesn't matter if YouTube intended it to have this function. It simply inadvertently has this function and that's enough. Now, one of the issues that's raised by the statutory definitions is whether the technological measure effectively controls access to the book if the measure, in the ordinary course of operation, requires the application of informational process or treatment with the authority of the copyright owner to gain access to the work. Now, if we disagree with you and think that gaining access to the work can also raise the question of the quality or the scope of access, whether it's merely access to watch or also access to download, what about the question of whether it's with the authority of the copyright owner? Does YouTube want people to be able to download it? Or is YouTube wanting to authorize its users to download by this complicated process? Or is that just kind of like a gap that people have perceived in YouTube's system that permits them to do something that YouTube doesn't want them to do? Well, as a preliminary answer, Your Honor, it's a great question and one that we should pose to YouTube during discovery. But even if you get past that, it's not as if YouTube is unaware of all of these mechanisms to download this content. They could have taken steps to close, as Your Honor calls it, the gap. They have not. Well, we don't know. Closing it might involve complications that they don't want to take on. We don't know. So what you opened by saying that they were factual questions that should have precluded the district court from granting a 12B6 motion. So which are the factual questions you're talking about? So, Your Honor, if you consider the fact that the statute has, in 1201A, A1 talks about the direct circumvention. And 1201A2 talks about the trafficking of circumvention tools and 1201B is also about trafficking and circumvention tools. The notices that the recording industry sent to YouTube involve only the trafficking question. So once you get to the trafficking question, Your Honor, the factual questions predominate every single one of the requirements under the statute. Is the software primarily designed or produced for the purpose of circumventing or are there other protections afforded to a technological measure that effectively protects the right of a copyright owner? So right in there, what was the intent of Ute? Were they trying to design or produce for the purpose of circumvention? Is there effective protection of a right of a copyright holder? The secondary question is, does the software have only limited commercially significant purposes? Aren't those potentially mooted by the third, by subparagraph C, which asks, is it marketed by Ute for use in circumventing? It would be if Ute marketed the technology for circumvention purposes. And there are sites that do just that. There are sites that say, you can get all of the music that you want for free. You don't have to pay for it. That's not Ute. Ute has never said that. Ute has simply said, we are a tool that you can use to download materials from any site that freely provides those materials to the public. Well, I mean, you rely on your narrow definition of the scope of access. If that argument goes away, if we interpret access to be something broader than you argue, to include the question of whether the access is merely for the purpose of watching or whether control of access also includes controlling it so that one can't download it, or not without complicated steps. Well, in part, Your Honor, I think we get back to somewhat traditional questions that were addressed by the Supreme Court in the Sony case. You have a television. Does the broadcaster of a TV show intend that someone can be able to record the show? Do they intend that someone should be able to skip through the ads? When TiVo came out, and now you can simply program it to skip the ads entirely as they record, was that intended? Is that what the broadcasters would like? Perhaps not. The Sony case didn't involve statutory language. The statutory language that I was just reading to you about with the authority of the copyright owner. Your Honor, I would argue that by providing their content to YouTube, knowing that anyone can access it at any time, they are indeed giving their permission for the access, at least. And access, and I think the cases do back this up, access is about the content, not about how the content is subsequently used. And with all due respect, I think the question of downloading and copying is how the content is used after the access is granted. It seems to me this is likely to be of great commercial significance to YouTube because YouTube pays money to copyright owners in order to be allowed to broadcast protected material, to put on their site broadcast material. But if the users can download it then, but YouTube makes its money from advertising that depends on the number of hits, at least to some degree, on the number of hits of downloads. I don't mean downloads, I mean watchings. And if users like, for example, a bar, a karaoke bar, can download the thing, and then it can be shown hundreds of times during a day or an evening or a weekend without there being any more hits to YouTube, that's a big difference for YouTube's economy, isn't that right? It is, Your Honor, but I have two responses to that again. The first is, one would expect, if that was YouTube's concern, that you would have an amicus brief from YouTube here, and you don't. And I think that that is significant and telling. The second, though, is that is the same concern, Your Honor, that every television broadcast had when the VCR came out. If you can simply record this, you can show it at your movie night. You can show it as many times as you want. The issue on which Sony was decided was fair use. I mean, it was all dictum, but the question was fair use, whether a single observation for time-shifting purposes would be permissible under fair use. But this is really quite a different question because this involves the matter of, as I was just saying a moment ago, repeated, repeated, repeated showings by persons who otherwise would be going through YouTube every time. Well, of course, Your Honor, again, the same argument could have been made for broadcast television or movies that are broadcast on television. You can show that movie as many times as you like. Well, you know, Sony made a point of saying only if it's a one-time showing for non-commercial purposes, solely for a family's convenience, because 8 o'clock when it's shown on TV, they'll be out so they want to watch it at 10. That's what was said to be permissible. And if the recording industry would like to make the argument and prove that that is the way that Ute is being used in the way that Your Honor is suggesting and not simply because someone wants to be able to have a song or a lecture available to them when they are outside of the range of Wi-Fi, then they should have that right to do that in discovery. But these are the types of questions that I think need to be more fully addressed before the court can possibly rule on the legal questions. I hope you will address during your argument the district court's finding of waiver with respect to... It seemed to me that I couldn't understand the district court's reasoning at all, and I hope you will talk about the district court's proposition that you waived your case with respect to 1201B by not arguing it in the motion that was addressed to 1201A. I'd be happy to do that right now, Your Honor. And part of the answer is exactly what you've just said. The district court had two reasons why they claimed that the 1201B argument was waived. One was it said, oh, well, you argued 1201A in your opposition to the motion that was filed by the recording industry. Well, of course we did. That's the way that it was framed in the motion that was filed. But even more than that, Your Honor, the complaint, and the district court says this, the district court says, well, the complaint talks about 1201 generally, globally, but it doesn't specifically mention 1201B. First of all, it doesn't need to. That's not the requirement. But more than that, the complaint all over the place talks about the rights of the copyright holder and how Ute Service does not traffic in a circumvention tool that interferes with the copying rights of the copyright holder. That is solely and exclusively a 1201B argument. It's made throughout the complaint, and so with all due respect to the district court, I didn't understand the waiver argument either, and quite honestly... 1201B was completely irrelevant to the issue raised by the motion attacking 1201A. Correct, Your Honor. I mean, if the, if the, if RIA would win under 1201A, the case is over, because you have to win both A and B in order to show that you're not in violation of the anti-circumvention regulations. We do, Your Honor. And they said, you lose on A. Well, if they're right, you lose, but if they're wrong, you still have, you still have to show B, too. You still have to show that you don't violate B as well as not violating A. Correct, Your Honor. Could, could you, before you sit down with the presider's permission, could, could you just highlight three factual issues that you think would be, benefit from being more fully developed before ruling was announced? You said the district court erred in drawing inferences against you and granting the motion to dismiss. So what in particular would be developed on a fuller record? So I think one thing that would be developed on a fuller record, Your Honor, is what precisely is the technological measure employed by YouTube, and does it, is it designed to prevent access? Is it designed to prevent copying? Or does it have some other use that YouTube is putting to it? So you'd need to go after YouTube as a third party. YouTube isn't a party here. Correct, we would need... And do third-party subpoenas and get them to testify and disclose their methods and other things about their business. We would need to ask YouTube as to... And, and that, Your Honor, is by the nature of the fact that the recording industry does not have any, and doesn't argue that it has itself, any kind of technological measure that it's put in place it could have. It's simply saying, hey, YouTube's doing it. Well, we don't know that. And that's a factual question that I think we are entitled to explore. I think it would be... YouTube's intentions as well as the practical... I mean, we know what's there because we know how you get around it by downloading the video files and the audio files separately and then merging them. So what exactly would YouTube be telling us? What they meant by not making it easier to download? Well, they could tell us that, Your Honor. They could also tell us why, if they consider this to be some sort of gap, why that gap hasn't been closed. But we wouldn't be bound by anything they had to say about it. I mean, I don't understand why it was incorrect for the district court to examine these measures and then decide whether it's a matter of law it fit. Well, in part because, Your Honor, I do think that there is a requirement that a measure that has been put in place is not simply incidentally limiting the access to the content. As I said, the door that is put up to keep out the rain and the snow, you wouldn't say that that's what Congress intended by the statute to keep out someone. I think also, Your Honor, each of the three requirements for the copy control protections has factual aspects to them. What was the purpose of the software? What was the purpose of the software, UTE software, as it was designed? Well, that's within your knowledge. It is, Your Honor. And we have pled. And the district court just chose to ignore it. But we've pled, look, the software is specifically designed so that it doesn't try and download anything that is protected by any kind of DRM. It is pled. And that's all that we had to do at this stage. But still, I'm asking you to identify what was incorrect to decide as a matter of law based on, you know, an incomplete record, as you described it. Well, I think also, Your Honor... Aren't you relying in answer to Judge Carney's question, aren't you relying on is primarily designed, primarily designed or produced for the purpose of circumventing in subparagraph A and in subparagraph B has only limited commercial significant purpose or use other than to circumvent? And then in paragraph C, whether it's... Well, no, paragraph C is a different issue. Aren't those part of your answer? Yes, Your Honor. They absolutely are. I think that those are the factual questions that need to be developed on a fuller record. All right, thank you. And I'll simply conclude by saying this is the type of case that calls out for expert witnesses. Almost every case that's been cited by the recording industry was decided after the district court heard expert testimony. We have the Electronic Frontier Foundation and GitHub both opining already that these are not technological measures that are designed to do the things that the recording industry is arguing that they do. All right, thank you. All right, well, you've got two minutes of rebuttal. Even though you got your money's worth. Thank you, Your Honor. We'll now hear from Ms. Ehler. Am I pronouncing that right? It's Ehler, Your Honor. Ehler, I'm sorry. No problem. Everybody gets it wrong. Rose Ehler, on behalf of Recording Industry Association of America, the RIAA. Good morning, Your Honors. Thank you, and may it please the court. I want to take just a step back for a second and describe what UTE is and then a little bit about what the DMCA is and get into the key factual allegations and the complaint that established UTE has really pled itself out of a declaratory judgment claim. So, UTE operates a stream-repping service. You can go to YouTube, which is an on-demand streaming service. The access that one can get through YouTube is streaming only. That's what RIAA's members put their sound recordings on YouTube for, streaming access. You can use UTE to go to YouTube and create a perfect HD copy of an audio file or a video file. But I could do that without UTE, right? There are instructions for how one could do it without UTE, but what UTE does is enable it on an automated basis and you could... I get that, but I guess, I mean, what is the technological measure that would be protecting this copyrightable material if I can do it myself? Well, just because you can do it yourself or you can hack the technological measure doesn't mean... No, I'm not hacking anything, right? I mean, I'm just going to... I could do this right now in this courtroom on my computer probably, right? Your Honor, could. I think it would be hacking. Let me describe the factual allegations that tell you why. So, this is paragraph 98 of the complaint. I think this is one of the two or three most important factual allegations. In paragraph 98, UTE alleges the technological measure that YouTube employs. It is a signature mechanism that then must be read and interpreted by JavaScript on the receiving end of the program to derive a signature value. That signature value is a number that must be sent back to YouTube in order to initiate the stream. I'm quoting exactly from paragraph 98. That is the technological measure that is used by YouTube and sits in that place in order to initiate the stream. What is the technological measure? I want to make sure I understand this. The technological measure in paragraph 98 is the signature mechanism that is used to derive a signature value. The process is that the signature value then gets sent to YouTube in order to initiate the stream. That process is the technological measure. That's just a URL identifier, right? No, it's more than that, it's JA 47 and 48 along with the images, Your Honor. So what you can see and I'll just tell Your Honors that the images are clearer in the actual second amended complaint than they are, that's on the district court's docket than they are on what is in the appellate docket in case there's any trouble zooming in to see the images. What you can see in paragraph 68 is the signature value. Your Honor is correct that it is part of a URL but it is a number and you can see it after the range equals. It's a number that starts with a seven digit starting with a six, a dash and there's another seven digit number starting 811. That number after range equals is the signature value and you can see it in the request URL. That is the range number that is sent to initiate the stream. What you then alleges in paragraph 69 and this is important so I'll emphasize it by taking a sip. What you then alleges in paragraph 69 is that it modifies that number. It modifies it to start with a zero and you can see this in the. But I could do  thing, right? Sure. You're saying I would then be violating the statute as well. Well, it might depend, Your Honor, because there are a division that applies to individuals who are circumventing and there are also exceptions in the statute itself for reverse engineering, other exceptions. But, sure, if Your Honor were downloading a music video file from YouTube in order to then cede hundreds or thousands of perfect HD copies that then could proliferate throughout the Internet, that is the sort of circumvention tool that the DMCA intended to ban with the anti-trafficking provisions of 1201. It just seems pretty easy to do this. And so it's hard to sort of see this as a technological measure that effectively controls access. So, the, I understand Your Honor's question, two responses. I mean, I think there's more actually going on with YouTube, but we just don't have it. So instead we have an opinion from the district court which is trying to infer things from the complaint. And I think that's the argument of YouTube, which is that there needs to be more  this. Your view is that this is it. There's nothing more than this. The argument of YouTube is that there needs to be more discovery. I, what I, the allegations in paragraph 98, 68, through 69 and then some of the paragraphs around those I think are absolutely enough to plead Ute out of a claim. The claims are not plausible as alleged and any further information that would be We know this from low. We know this from the Ramirez case which was the district court case that then went up. You mean that what do you need to plead to show a technological measure that effectively controls the strength Yes, Judge Carney, the strength of the technological measure can be a wrong technological measure in order to be protected by the statute. The strength is not what we look at. We look at how it operates in the ordinary course and whether in the ordinary course of the operation it serves the function of limiting or controlling access How do we know that? I mean, how do we know it's not just the contractual provision that is doing all the work here? You wouldn't suggest that the contractual provision is a technological measure, would you? That's not what I'm suggesting, Your Honor. But if that's what is in paragraph 98, the technology enables initiation of a stream. There's then half a dozen, a dozen paragraphs about all of the steps that somebody would have to go through that are by definition outside the ordinary course. By definition it is outside of what? The  course of the operation of the technological measure and how YouTube otherwise would stream the work. YouTube doesn't tell people how they can download a YouTube video. Correct, Judge LaValle. And how many steps does it involve? I don't have the exact number. I think you could slice it different ways but at least a half dozen to a dozen if you're doing it by hand. YouTube says it automates those but it is interacting with that technological measure in the same way where it's changing the signature value. You call it a technological measure and I think that's really the issue. Is this a technological measure or is this just the way that YouTube downloads content and the way to copy that or expand it even is to take these other steps. But it's not clear that there's any difference between the download of the stream. You get to a separate audio file and a separate video file that you then are going to need to use additional software to remix together to create a stream.    have to use the stream to get to the download. You only get to a download if you engage in the complicated steps or use an illegal circumvention tool like ute to go beyond the technological measure to get to the download file. What if the separation of the audio and video files is merely meant to ensure that you can get downloads of each that are consistent with your computer's   get to the download file. You don't have a red download button but still maybe there are other reasons that dictated the separation of the two files rather than using that as a measure to control as Judge Sullivan is suggesting. Thank you for the question, Your Honor. I don't think we need to look at what the intent is in either direction. There's no intent in the statute. The statute looks at the technological measure and how it operates, how it functions in the ordinary course and whether in fact that functioning serves as a means of controlling access. But how are we able to know that from the pleadings? How are we able to know how it works in the ordinary course? I mean, it's a contractual provision. There must be a technological measure. He sort of backwardly engineered it, it seems to me. This could be easily solved. And my hunch is when it is, it's going to be clear that there are other technological measures that are here. But right now, this is the 12B6 stage. But this court doesn't need to check common sense at the door. And it indeed would be pointless and waste judicial resources for this case to go back down. The allegations and the complaint give you everything you need in those paragraphs to know what the ordinary course is. We see how YouTube operates with a stream. Paragraph  64 says in the ordinary course you can watch a music video, view a music video. What we're saying, though, if we agree with you, is that anybody who does this systematically non-technological they're doing it step by step is engaging in a violation of the statute. So there are some pretty big stakes here. As I articulated before, Your Honor, I think it actually depends on the context of what that's going to be because there are exemptions in the tri-annual rulemaking process that exist for 1201A1 violations which are not an issue in the case. The point of the A2 provisions and the B1 provisions, the anti-trafficking provisions, is to take circumvention tools like Ute off the market because they're what contribute to the mass infringement of copyrighted works. So that's a different question that's not before this court. Could I ask as to A1, your adversary made the argument that there's no measure that is controlling access to the work because we click on put the video in or that we click on the URL of YouTube, we go to YouTube and we say Taylor Swift, you know, whatever and we get access to it. And that really what we're talking about here is the trafficking provision and downloading and copying in that way. Do you agree with that? I don't agree with that definition of access, Your Honor. Either provision is sufficient to go to a question that Judge Laval had earlier. This Court can either affirm on 1201A or 1201B. What does access mean? It's not just access, it controls access. So the 1201A is about whether the technological measure functions to control access as compared to something that is unrestricted. So to use some of the cases cited in Utes brief as an example, the Lexmark case, there was no measure. You could read the software code directly from the printer's memory without the authentication sequence. There was no technology gating between the user and the software code that's different here where we have technology that is used to initiate the stream but otherwise gates and blocks. What if I don't want the video, I just want to listen to the music and download the music? It's easy to do. Your honor should lawfully pay for it on a streaming service that permits downloads. YouTube is an on-demand streaming service. The ordinary course operation is ad supported on-demand streaming. To adopt the definition of freely accessible that pushes such that 1201A would not apply to an ad subscription or some other means which is the opposite of what the anti- circumvention provisions of the DMCA intended which were to encourage copyright owners to make works available online which we all benefit from. But you're not saying we should take into consideration in construing the language of the statute whether a provider is ad supported or otherwise supported are you? The statute focuses on what the technological measure does. And so if the provider is ad supported and enables streaming but does not in the ordinary course enable downloading which is exactly the case for YouTube and we can see that in paragraph 62 through 64 where you can watch or view videos on YouTube then that's what matters for purpose of the technological measure controlling access so that So that has limited ability to access then it here we know exactly what that measure is how it operates that in the ordinary course it operates to initiate a stream and not to initiate a download. There might be a different case where we're looking at a as it operates on YouTube and what it does in the ordinary course and then the modifications required in order to get to the download which are circumvented. Can we tell what the ordinary course is? I mean in terms of computer use what generation do we look at? And what you know there are people with a huge technological capabilities who are out there and it's very much the ordinary course for them. It's the ordinary course operation of the technological measure your honor so we look at in the complaint paragraph 62 through 64 describe viewing a music video file on YouTube then paragraph 98 describes how in the ordinary course of the technological measures operation you derive the signature value the signature value which again was that seven digit number dash seven digit number followed by an eight is sent to YouTube which then initiates the stream that's the ordinary course operation we compare that to what you says it does  modifies and changes that signature value to get to a different window and go through a different course that gets to downloading. I keep and it's being a countermeasure I'm having trouble figuring out what the countermeasure is. The signature mechanism is an aspect of the YouTube operation I don't think it's the whole YouTube operation it's just an aspect of it but but it is that's how you get access to the stream right? It's how you get control to access the stream and not other access. It's just how you get access to the stream and you're saying that somebody who sort of amps it up is somehow avoiding a technological measure that's designed to prevent access. If you're modifying the technological measure then the ordinary course limits access to streaming or restricts access controls access to streaming if it's being modified that is avoiding or bypassing that measure in order to gain access to the downloadable file and then of course download it. I would like to go back to the question of what is a technological measure because there's a distinction that seems to me might be pertinent because there are two kinds of measures. There's a contractual measure and there's a technological measure but I don't understand how anything that one does to get access to YouTube videos is anything other than a technological measure. There might be a contractual measure that is all technological isn't it? Isn't it whatever you can and can't do or the difference between something that takes one step to do by pressing on a button as opposed to something that takes 16 steps to do and you have to have considerably more knowledge and do research on how to do it. It's all technology isn't it that provides this to us? It's all technology Your Honor but it's not all necessarily a technological measure that in the ordinary course of its operation Well that's different. That's different but the question was being argued before whether this is a all of this operates through technology and it's a technological measure as opposed to let's say a contractual measure that controls that controls whatever it controls. That's right Your Honor and there's one other example that may be helpful in this framework. There's you know a contractual measure is going to be different than a technological measure. You also have instances where technology is involved but there's no measure serving as the gating function between the user and the copyrighted work. And so that's the Lexmark case, the digital drilling data case where the copyrighted work is the software code and the software code is the interaction with the technological measure to get to the copyrighted work. Here what we have is a copyrighted work which is the audio video file right music video file and then we separately have software code that exists between the user and the audio video files and so you've got that measure that serves as a gating function either into 1201A or 1201B but blocks access and prevents downloads of the files. You said earlier that there were no issues of intention, no issues here but how about the issue of with the authority of the copyright owner in 1201A3B that kind of raises the question whether the ability to download that's provided by that's inherent in YouTube if you follow instructions that you can get on the internet not from YouTube but from people who have just put those things up there to tell you how to do things whether the gaining of access in that fashion is with the authority is that something that YouTube wants you wants its customers to be able to do or is it a gap in YouTube's effort to make this a streaming only service that people have figured out that you can get around by doing these six steps which raises another question that you discussed with Judge Sullivan as to what is hacking? Isn't hacking just something that anybody can do if they have sufficient familiarity to know or have a set of instructions so they can just follow those instructions you can hack if somebody has taught you how to hack. It's all stuff that's accessible. Yes, Judge LaValle, and that's the sort of hacking that was at issue in Corley. Right, Corley started with the copy of the code that was just being disseminated via Hacker Magazine on Your Honor's question regarding it's with the authority of the copyright owner and so it's not YouTube who we're interested in. It's the copyright owner and there's no allegation YouTube is the licensee and I assume that when the statute speaks of the copyright owner it also should be interpreted to include the licensee because the copyright owner in many instances isn't involved in any of this at all, doesn't know, doesn't care, just it's getting a stream of payments from a licensee who is standing in the shoes of the copyright owner. So I don't think that's a distinction. I think the statute intends that when it refers to copyright owner it also means a licensee of a copyright owner which is exploiting the copyright. Understood, your honor. I think either way, right, YouTube would only have the authority that was provided to it by the copyright owner so there's no allegation that Taylor Swift is permitting YouTube to enable downloads of the Taylor Swift music video but even if it's YouTube there's Well the copyright owners are being paid by YouTube to show their stuff, to put their stuff on the YouTube videos. Right, and so with YouTube we do have the terms of service which the district court properly took judicial notice of which do establish that there is not authority to circumvent or to download and those are in the record but even if we didn't look at the YouTube terms of service, I think the fact that these instructions are, you have to get them from third-party websites or Ute is indicative that YouTube is not giving these instructions itself to its users. What you're saying is that the YouTube terms of service can shed light on whether on whether the ability to download from YouTube is something that YouTube is providing authority for is saying yes, here's how you do this, here's how if you want to download it, go right ahead there are these 11 simple steps that you can follow or whether YouTube has somehow left a gap in its protection measures that were designed to have people not download them. To put it differently, Your Honor, and I apologize for going over time to put it differently, I don't think that Ute could, without violating Rule 11, plead that YouTube authorizes this sort of circumvention behavior because of the YouTube terms of service. That would be an improper sanctionable pleading and there's other, again, this is not in the complaint, but there's other evidence that Ute has with respect to international decisions, declarations from YouTube witnesses that also mean Ute could not in good faith plead that YouTube enables this sort of downloading. Why aren't these things that are, why aren't these things we're discussing issues of fact? Because we don't need them, Your Honor. We have, we have, we have the facts in the complaint. We don't need to get there. We are at a 12B6, but just like a plaintiff, any plaintiff may plead themselves out of a case at a 12B6 stage, Ute's declaratory judgment actions are not plausible as they are pled and there's no plausible additional facts through discovery that they could bring into the case. All right, we got our money's worth out of YouTube. Oh, sorry. Before you, before you stop, I, I, I want to know do you have any answer to the, um, to the district court's, um, do you have any, any argument to defend the district court's proposition that, um, the plaintiff waived, um, waived its allegations that it had failed to prove that it didn't violate A? I have great respect for Judge Underhill and I think that he was reacting to the fact that it was not argued or briefed and during oral argument Ute's counsel suggested Why should it be when it wasn't an issue? Um, Somebody, somebody makes a motion to dismiss a complaint because, let's say, um, the, the, the, the, uh, activity didn't involve interstate commerce. Now, does the person who's, um, who's arguing against that to preserve the complaint say, well, okay, we say it does violate it and it does involve interstate commerce but we are, we want to, you know, we're standing on all of our other allegations as well. I mean, what's involved in the motion to dismiss is what's involved in the motion to dismiss and you don't have to argue everything else that's in the case, right? Um, that's true. When you say, when you opened by saying that you have great respect for Judge Underhill, I do too, but we're talking about whether he was right or wrong in this particular instance. Do you have anything to say to that? He did not need to reach the 1201B because he resolved the case on 1201A. But the question is was he right or wrong in saying that, um, that, that failure to argue B waived the right to continue with it if it should turn out that, um, that his ruling with respect to A is overturned? I think that if the ruling with respect to A is overturned, there's, this court could decide 1201B because it is argued on appeal and it's not  to continue with it. I don't think they've waived it, Your Honor. Thank you. All right. Mr. Freywitzer, you have two minutes to rebuttal. Thank you, Your Honor. Let's see if that turns out to be true. The court has been very generous with its time and I'm going to try and keep it brief. I have three quick points. The first is I wanted to return to a question that a number of Your Honors addressed with the question of intent and supposedly the statute not talking to intent and I direct the court to pages 9 through 12 of our reply brief starting with this section designed to prevent access to a work and the focus of subsection 1201B1 is circumvention of technologies designed to permit access to a work but prevent copying of the work. We have three pages of articles which were designed to deal with diabetes but they are great at other stuff too. I don't know that that is going to matter so much. I would specifically point the subsection 1201B1 is designed to control access and does so effectively intent may be relevant. The second point your honor is that I heard counsel use the word inferences a number of times and she's absolutely right that the district court made inferences and there's only one direction that the district court is allowed to make inferences and that would be in favor of  district court. So with that we will conclude the opening argument. Thank you both. It was very well argued. We will reserve decision.